**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **GRUPO HGM TECNOLOGIAS SUBMARINA, S.A.,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO. 1:18-00430-JB-N** |
| | ) |
| **ENERGY SUBSEA, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

On August 2-3, 2021, this matter came before the Court for a bench trial on Plaintiff Grupo HGM Tecnologias Submarina, S.A.'s ("Grupo") claims against Defendants Energy Subsea, LLC ("Energy Subsea") and Oddgeir Ingvartsen ("Ingvartsen"). Grupo alleges Energy Subsea breached a maritime contract. Grupo also contends Ingvartsen disregarded the corporate form and that both Energy Subsea and Ingvartsen committed fraud in inducing additional payments and were unjustly enriched by those payments. (*See* Doc. 72). Energy Subsea and Ingvartsen deny Grupo's claims and contend the maritime contract was voided by the parties. (*Id.*).

At trial, the Court heard testimony from Grupo personnel Francisco Javier Martinez-Navarro, Manuel Delgado and Angel Omana and Defendant Oddgeir Ingvartsen. After due consideration of the witnesses' testimony, other evidence presented, and the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**I.     FINDINGS OF FACT**

Plaintiff Grupo is a Panamanian company with its principal place of business in Venezuela. Grupo is engaged in support of the offshore petroleum industry, specifically, undersea work with

robots including construction, salvage, location, repair and maintenance. Francisco Javier Martinez-Navarro is the CEO and 60% owner of Grupo. He formed the company in 2013 with Atle Haugvaldstad ("Haugvaldstad"), who is a Norwegian contemporary of Defendant Ingvartsen. In 2013 Martinez and Haugvaldstad were 60/40 owners of Grupo. In 2016, Haugvaldstad renounced his shares in the company and Martinez became the sole owner. (Ex. 93). In 2018, Martinez was forced to borrow money to pay Energy Subsea, eventually making Gerardo Jose G. Corado Machado a 40% owner of Grupo. (*Id*.). Grupo presently has twelve employees, including Commercial Manager Manuel Delgado and Operations Director Angel Omana.

Defendant Energy Subsea is a Florida Limited Liability Company established in 2013 which operates from Mobile, Alabama. Defendant Ingvartsen is the managing member of the LLC. Energy Subsea is engaged in undersea work with robots, ROVs and sonar, including construction, salvage, location, repair and maintenance. After leaving Grupo, Haugvaldstad worked in Venezuela for Energy Subsea. On June 14, 2021, Ingvartsen signed a Letter of Representation representing that Grupo was Energy Subsea's representative in Venezuela for a period of three years.[1] (Ex. 1).

In July and August 2017 two small jets crashed off the coast of Venezuela. Grupo was approached by Haugvaldstad in an effort to secure a contract for finding and recovering the aircraft. Energy Subsea represented it could provide the necessary equipment and perform this work.

---

[1] Mr. Martinez-Navarro testified that this letter of representation supported ongoing efforts of Energy Subsea and Grupo to develop business in the Venezuelan off-shore oil fields. Martinez-Navarro also testified this relationship made Energy Subsea Grupo's first option for any Venezuelan work.

Energy Subsea provided quotes to Grupo in August 2017 to provide a vessel and equipment needed by Grupo to locate and recover the planes and the passengers' remains. In connection with the quotes, Energy Subsea represented to Grupo that it had a relationship with Laborde Marine in Louisiana and would use a Laborde Marine vessel to perform the work for Grupo.

Energy Subsea and Grupo negotiated the cost, scope and equipment required for the aircraft recovery project, ultimately agreeing that Energy Subsea would provide vessel and equipment to Grupo for a lump sum of $650,000 excluding fuel, lubricants and water. The initial contract amount of $450,000 would be paid for mobilization of the vessel and equipment and then $200,000 was to be paid after the first 30 days of operation. Additional work required after the first 30 days would be paid at a daily rate of Twenty-Five Thousand Dollars ($25,000) for operations and Thirteen Thousand Dollars ($13,000) per day for transit time. Mobilization of the vessel and equipment was to begin upon payment by Grupo of the first $450,000 payment.

A Contract for the Provision of ROV, Support Vessel and Associated Work was signed by Grupo and Energy Subsea on September 27, 2017 ("Energy Subsea Contract"). (Ex. 15). The Energy Subsea Contract required the following equipment to be provided:

1. DP2 vessel, minimum 27 passenger capacity
2. 20T crane/ A frame
3. Work class ROV
4. OBS 2 class ROV
5. OBS ROV
6. Side Scan Sonar
7. HPR System; and
8. Accommodations and office units

(*Id.*). The Energy Subsea Contract's scope of work specifically included:

1.  Side scan sonar run to localize lost aircraft one Lear Jet 25 and one Gulfstream III
2.  ROV operations to recover casualties (5 bodies) + (7 bodies) and air crafts black boxes, if any; and
3.  Survey of all parts and recovery of parts as instructed by client
4.  Side scan survey of Dragon field

(*Id*.).  The Energy Subsea Contract specified mobilization would start as soon as payment had been received.

Grupo soon learned that a funds transfer from a Venezuelan bank to a bank in the United States presented an unexpected logistical difficulty.  Ingvartsen suggested he had a relationship with a Norwegian company, "Ingvartsen AS," which had a European bank account and could be used to facilitate the transfer of funds from Grupo.  Grupo wired the initial payment of $450,000 on September 29, 2017.  To create documentary records consistent with the flow of the money, a similar contract for the Provision of ROV, Support Vessel and Associated Work was signed by Ingvartsen on behalf of Ingvartsen AS and by Grupo.  (Ex. 16).  Grupo did not negotiate with Ingvartsen, AS concerning this "contract."  It was always the intention of Grupo that the contract would be performed by Energy Subsea and the Ingvartsen, AS contract was only intended to facilitate transfer of Grupo's funds to Energy Subsea due under Energy Subsea Contract.  It was never intended that Ingvartsen AS would supply the vessel and equipment that Energy Subsea had contracted to provide, or that the Energy Subsea Contract was cancelled, superseded, substituted or nullified by the Ingvartsen AS contract.  Neither was there any course of conduct between Grupo and Energy Subsea (or Grupo and Ingvartsen AS) demonstrating a cancellation, superseding, substitution, or nullification of the Energy Subsea Contract.  The Court does not find the contrary testimony of Oddgeir Ingvartsen credible.   At all material times, all parties

understood and intended the Energy Subsea Contract to be in full force and effect, and that Energy Subsea would perform the obligations set out in that Contract.

On October 2, 2017, Energy Subsea's representative, Atle Haugvaldstad, sent an email to Grupo, advising Energy Subsea would have a vessel with all necessary equipment ready to sail from the United States within 5 days of receipt of the first payment of $450,000 from Grupo. On the same day, Mr. Haugvaldstad also sent Grupo a document entitled "Energy Subsea Mobilization Procedure," advising the transit time from the United States to Venezuela would be (7) days. This correspondence induced Grupo to expect and believe that within twelve (12) days of its payment of $450,000, Energy Subsea would be onsite in Venezuela with the vessel and all equipment ready to begin the work.

On October 8, 2017, Haugvaldstad represented to Grupo that Energy Subsea was 90% sure the M/V HILDA LAB would be the Laborde Marine vessel performing the job. This representation was consistent with the previous representations that Energy Subsea would use a Laborde Marine vessel to perform the job. In actuality, on October 8, 2017, Energy Subsea had not even discussed a charter with Laborde Marine for this project.

On September 29, 2017, Grupo wired $450,000 to Ingvartsen AS as payment to Energy Subsea under the Energy Subsea Contract as agreed. On October 10, 2017, Oddgeir Ingvartsen emailed Grupo's representatives, Francisco Martinez, Manuel Delgado and Angel Omana to let them know that the wire transfer was received in Norway on October 5, 2017, and that wire transfers were immediately initiated to Energy Subsea and to Kongsberg (side scan sonar seller). Wire transfers were made by Ingvartsen AS to Energy Subsea on October 10, 2017 ($97,950), October 11, 2017 ($101,950), and October 12, 2017 ($122,310), totaling $322,210, which is

consistent with Energy Subsea performing the job.  A wire in the amount of $35,868 was sent to Kongsberg to purchase side scan sonar equipment to be used on the job.

Despite prompt payment, Energy Subsea did not immediately mobilize a vessel and equipment as promised.  On October 17, 2017, Ingvartsen advised Grupo that the original vessel he intended to use to perform the job was unavailable.  Despite Grupo's payment of $450,000, Energy Subsea provided only side scan sonar equipment, which was purchased with money paid by Grupo.  Energy Subsea did provide two men to operate the side scan sonar equipment and the equipment was used onsite in Venezuela for a total of 22 days.

Although the side scan sonar equipment purchased with Grupo's money was provided by Energy Subsea, Grupo had to locate and provide the topside equipment, crane, control cabin and pay to mobilize this equipment onto a Petróleos de Venezuela, SA ("PDVSA") vessel.  Because Grupo had to provide this equipment and vessel, Energy Subsea returned $100,000 to Grupo to cover some of the costs associated with that work.

In the quotes provided by Energy Subsea in August 2017, the day rate for the side scan sonar equipment was $650 and the day rate for the side scan operators was $1,250.  The side scan sonar operations took 22 days, so based on the day rate quoted by Energy Subsea, the side scan sonar operation would have a value of only $52,668.  Angel Amana testified the side scan sonar work had a value of no more than $52,668.

Later, Ingvartsen and Energy Subsea demanded an additional payment of $200,000 from Grupo, representing these funds were needed to charter a vessel to perform the job.  Even though the contract did not yet require an additional payment, Grupo acquiesced to the demand, borrowing $200,000.  Grupo's lender had a bank account in the United States, allowing that third-

party to wire the $200,000 directly to Energy Subsea on November 6, 2017.  Payment of the additional $200,000 from Grupo again did not result in mobilization of a vessel or equipment.

Energy Subsea's continued refusal to mobilize a vessel and equipment as promised inspired Grupo to request a return of at least of some of the money it had paid.  In response to this request, Ingvartsen presented Grupo with an "invoice" from Ingvartsen, AS for the side scan sonar work.  These invoices were well above market value for the work and were substantially greater than the rates quoted by Energy Subsea.

In January 2018, Ingvartsen and Energy Subsea demanded an additional €216,500 ($256,786.32) from Grupo, claiming the funds were needed to charter a vessel, provide the equipment and mobilize to perform the job.  Growing increasingly desperate to secure performance of its contract with the Venezuelan government, Grupo again complied and made this payment.  To facilitate this payment, Ingvartsen offered the bank account of yet another Norwegian company, Energy Salvage, AS ("Energy Salvage").  Grupo followed Ingvartsen's instructions and wired €216,500 ($256,786.32) to Energy Salvage, on January 23, 2018.  The next day, Energy Salvage wired $257,950 to Energy Subsea.  Despite making this additional payment Ingvartsen and Energy Subsea did not mobilize a vessel or equipment as promised.

In February 2018, Ingvartsen and Energy Subsea demanded even more money from Grupo for fuel.  Grupo, growing increasingly desperate for the vessel and equipment so it could fulfill its obligations to the Venezuelan Civil Authority, yielded to this additional demand by delivering 800 metric tons of fuel to Energy Subsea in Mobile, Alabama.  Rather than fuel a vessel (which it still had not provided), Energy Subsea sold the fuel on March 3, 2018, for $359,260.

After the fuel sale on March 3, 2018, Ingvartsen advised Grupo that exorbitant additional funds would still have to be paid before he could provide a vessel to perform the job.  At this point Grupo realized Ingvartsen and Energy Subsea had no intention of performing the contract as agreed and sought another company to perform the work.  Grupo contracted with Bordelon Marine on July 10, 2018 to perform the remaining scope of work at a cost of $1,727,000. Bordelon Marine completed the contract expeditiously and successfully.

II.     **CONCLUSIONS OF LAW**

    **A.  Jurisdiction and Choice of Law**

When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation.  *Kossick v. United Fruit Co*., 365 U.S. 731, 735 (2004).  The United States Constitution grants jurisdiction to this Court to hear cases involving the interpretation of maritime contracts.  *See* Art. III, § 2, cl. 1 (providing that the federal judicial power shall extend to "all Cases of admiralty and maritime Jurisdiction"); *see also* 28 U.S.C. § 1333(1) (granting federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction").

To determine whether a contract is a maritime one, a court must determine "'the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'"  *Kirby*, 543 U.S. at 24 (quoting *North Pacific S.S. Co. v. Hall Brothers Marine Railway & Shipbuilding Co*., 249 U.S. 119, 125 (1919) (citing *Insurance Co. v. Dunham*, 11 Wall. 1, 26, 20 L.Ed. 90 (1871)).  *See also Exxon Corp. v. Central Gulf Lines, Inc*., 500 U.S. 603, 611 (1991) ("[T]he trend in modern admiralty case law ... is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime").

In this case the Contract involved the charter of a vessel in the United States to travel to the waters off the coast of Venezuela to locate and salvage the wreckage of two small jets.  The Contract also provided for sophisticated equipment and operators to conduct this underwater location and salvage work.  The Court finds the nature of the Contract is clearly maritime and the parties agree.

**B.  Breach of Maritime Contract**

To recover damages for breach of contract under federal maritime law, a plaintiff must prove (1) the terms of the maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages.  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).  The remedy for a breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.  *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997).

There is no dispute that the parties entered into a binding contract, which was memorialized by the execution of a written contract offered by Grupo as Exhibit 15.  The contract itself, the Energy Subsea Contract, is signed by Francisco Javier Martinez-Navarro and Ingvartsen. There is also no dispute that Energy Subsea did not perform the contract.  The parties disagree about whether the contract was substituted, cancelled or otherwise voided.

Grupo maintains it always understood and intended Energy Subsea was to perform the Contract.  This was the repeated testimony of all three Grupo witnesses at trial.  Ingvartsen, on the other hand, testified that the Energy Subsea Contract was voided when he (on behalf of Ingvartsen, AS) and Grupo signed the AS contract.  Defendants contend the second contract

signed between Grupo and Ingvartsen, AS relieved Energy Subsea of its contractual obligation to perform the Energy Subsea Contract.

Essentially, Energy Subsea contends there was a novation of its contract with Grupo. This argument fails because Energy Subsea offered no evidence supporting this claim. No correspondence, no cancellation agreement, not even a testimonial account of a discussion with any representative of Grupo hinting at an agreement the Energy Subsea Contract was no longer in effect.[2]

A novation is a well settled under Alabama contract law:

> "A novation is the substitution of one contract for another; a novation releases the party bound by the original contract. A novation extinguishes the preexisting obligation." *Golden v. Bank of Tallassee*, 639 So.2d 1366, 1369 (Ala.1994). "Novation requires: '(1) a previous valid obligation; (2) an agreement of the parties thereto to a new contract or obligation; (3) an agreement that it is an extinguishment of the old contract or obligation; and (4) the new contract or obligation must be a valid one between the parties thereto.'"

*Safeco Ins. Co. of Am. v. Graybar Elec. Co.*, 59 So. 3d 649, 656 (Ala. 2010) (quoting *Boh Bros. Constr. Co. v. Nelson*, 730 So.2d 132, 134 (Ala.1999) (*quoting Warrior Drilling & Eng'g Co. v. King*, 446 So.2d 31, 33 (Ala.1984)). The only evidence submitted to the Court on the issue of novation was submitted by Grupo. All three Grupo witnesses testified that their understanding was always that Energy Subsea was performing the Energy Subsea Contract. The second contract with Ingvartsen, AS was merely a vehicle to facilitate payment to Energy Subsea on the Energy Subsea Contract through a friendly company with a European bank account. The same can be said for the later purchase order issued to Energy Salvage, which is another of Ingvartsen's various

---

[2] The fiction that Energy Subsea transformed into a subcontractor when Grupo signed documents facilitating payment to Energy Subsea was completely unsupported by any such subcontracts. Energy Subsea did not even try to support this affirmative defense with evidence at trial.

corporate entities.  Key here is the fact that whenever funds were transferred by Grupo to a company facilitating payment on behalf of Energy Subsea, the funds always ended up being transferred to Energy Subsea.

Based on the testimony and evidence produced at trial, the Court finds that the Energy Subsea Contract was not cancelled and Energy Subsea was not relieved of its contractual obligations under it.  The Court finds in favor of Grupo on the breach of contract claim.

### C.  Alter Ego

The Amended Complaint also alleges "Ingvartsen organized and controlled Energy Subsea in such a manner as to make it a mere instrumentality of himself."  (Doc. 53).  In exceptional circumstances, the courts may disregard the corporate form and pierce the corporate veil of the corporation in order to hold alter egos of the corporation liable for the obligations of the corporation.  *Baker v. Raymond Int'l, Inc*. 656 F.2d 173, 1719 (5th Cir. 1981).  A finding or control or domination of a corporation by an individual or a corporation and the abuse of the corporate fiction are necessary prerequisites to the application of the alter ego theory of liability.  *Talen's Landing Inc. v. M/V Venture, II*, 656 F.2d 1157 (5th Cir. 1981).

Once a finding of control and domination is established, "it is appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing."  *Talen's Landing*, 656 F.2d at 1161 n.6 (citing *In re Ira Haupt Co.*, 289 F. Supp. 966, 971-72 (S.D.N.Y. 1968); *American Anthracite B Coal Corp. v. Amerocean S.S. Co.*, 1955 AMC 653, 131 F. Supp. 244, 248 (E.D. Pa. 1955); *Bossier Millwork & Supply Co. v. D & R Construction Co.*, 245 So. 2d 414, 416-17 (La. App. 2 Cir. 1971); La. Rev. Stat. Ann. sec. 12:95 (West 1969)).

The focus is not on an individual's personal misconduct, but on whether the corporate form itself was abused and whether the misuse of the corporate form constituted the fraud or injustice complained of in the underlying suit. *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993). In contract cases, fraud is an essential element of an alter ego finding. *United States v. Jon-T Chemicals, Inc*. 768 F.2d 686, 691 (5th Cir. 1985).

The evidence introduced during trial demonstrates Invartsen's domination and control over Energy Subsea. In particular, the banking records introduced demonstrate no appreciable difference between the two. Ingvartsen opened the bank account for Energy Subsea with a $100 deposit on the day Grupo transferred the initial payment of $450,000 dollars to Ingvartsen AS for payment to Energy Subsea. After that, virtually the only source of funds coming into the Energy Subsea account were funds paid by Grupo or Ingvartsen. Funds were then transferred back and forth between Ingvartsen and Energy Subsea constantly. Ingvartsen acknowledged this relationship by testifying he was the creditor of Energy Subsea, transferring money into its account when it needed it and withdrawing funds when it had them available. This pattern continued, with the Energy Subsea balance dwindling until it was left with a negative balance at the end of July, 2018, when Grupo moved on, contracting with Bordelon Marine to perform the Energy Subsea Contract.

Based on the evidence in the record, the Court finds Ingvartsen disregarded the corporate form of Energy Subsea, rendering it a mere instrumentality of himself. Accordingly, Ingvartsen is liable to Grupo, jointly and severally, along with Energy Subsea.

### D.  Unjust Enrichment

Count Four of the Amended Complaint alleges a claim of unjust enrichment against Energy Subsea, contending Energy Subsea holds funds belonging to Grupo.  (Doc. 53).  No action exists for unjust enrichment if the plaintiff has an adequate remedy for breach of contract.  *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., ITT*, 139 F.3d 1396, 1413 (11th Cir.1998) ("Recovery on a theory of unjust enrichment however, is only available 'when as a matter of fact there is no legal contract.'").  Because the Court has found a valid contract between Energy Subsea and Grupo, that contract precludes an action for unjust enrichment.  Count Four of the Complaint fails to state a claim upon which relief can be granted.

### E.  Fraud

Count Two of the Amended Complaint alleges fraud against Ingvartsen and Energy Subsea.  (Doc. 53).  More specifically, Grupo claims the Defendants induced it into paying $616,046.32 dollars above the contract amount through their misrepresentations and false assurances.  Grupo further contends that the Defendants misrepresented the price to perform the job knowing full well they had no intention of doing so.  (Doc. 53).  Alabama law applies to Grupo's fraud claim because the Court does not find this claim to be a maritime tort. "Determination of whether or not a tort is maritime . . . traditionally depended upon the locality of the wrong."  *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253 (1972).  "If the wrong occurred on navigable waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not.  *Id*.  "Navigable waters" is defined as a "waterway [which] in its natural and ordinary condition affords a channel for useful commerce."  *U.S. v. Joseph G. Moretti, Inc*.,

478 F.2d 418, 428 (5th Cir. 1973).  Because the claims themselves involve misrepresentations made from Alabama to Venezuela , the Court finds Alabama law applies, and the parties agree.

The elements of a fraud claim under Alabama law are (1) a false representation; (2) concerning a material fact; (3) reliance upon the false representation; and (4) damages as a proximate result. *Harmon v. Motors Ins. Corp.*, 493 So. 2d 1370, 1373 (Ala. 1986); *Aliant Bank, a Division of US Ameritrade v. Four Star Invest. Inc.*, 244 So. 3d 896, 928 (Ala. 2017).

Throughout the parties' course of dealing between August 2017 and July 2018, Ingvartsen made repeated representations to Grupo that were false.  Ingvartsen represented that he and Energy Subsea were capable of performing the job and providing the required equipment; that they had arranged a vessel to perform the job; that upon receipt of the initial payment of $450,000, the equipment would be mobilized on the vessel and the vessel would be on site in Venezuela shortly thereafter; that upon receipt of an additional payment of $200,000 in November, 2017, a vessel would be immediately mobilized to travel to Venezuela; and that upon receipt of even more payments in January and March, the vessel would be mobilized and the job would be performed.  Ingvartsen never assembled the requisite equipment, never hired a vessel, and never performed.  Grupo reasonably relied on Ingvartsen's representations and promises. Grupo paid the initial $450,000, a second payment of $200,000, a third payment of $256,786.32 and a fourth payment of $359,260, which was made in the form of fuel oil.  The payments were made in reliance on the representations of Ingvartsen that Energy Subsea had the ability to perform and would perform.  Ingvartsen's misrepresentations induced Grupo to act in a way that it would not otherwise have acted.

14

Very shortly after discussions began in August 2017, Energy Subsea and Ingvartsen misled Grupo into believing that the job would be performed with a vessel provided by Laborde Marine. Energy Subsea and Ingvartsen went so far as to provide vessel certification information on Laborde Marine vessels. At one point, Energy Subsea represented that it was 90% certain that the vessel that would be provided to perform the job was a Laborde Marine vessel. It turns out that at the time the representation was made, Energy Subsea had not contacted Laborde Marine about this job. It certainly had not determined availability or obtained quotes or other pricing information. Ingvartsen admitted in his deposition that Energy Subsea has never hired a vessel from Laborde Marine.

Additionally, when impediments arose to the wiring of money from a Venezuela bank account to a United States bank account, Ingvartsen assured Grupo that he had a workaround that would solve the problem.  That workaround involved the initial wiring of money from Grupo to Ingvartsen AS, with whom Ingvartsen had a relationship.  It also involved Ingvartsen AS then wiring the money to Energy Subsea, as it was the entity that would perform the job.  Grupo followed Ingvartsen's instructions, and wired money to Ingvartsen AS.  Ingvartsen AS then wired the money to Energy Subsea, which was consistent with the parties' intent and agreement that Energy Subsea was to perform the job.  Until Grupo became convinced, rightly so, that Energy Subsea would never perform and retained another contractor to do so, Ingvartsen and Energy Subsea never acted as if any entity, other than Energy Subsea, was to perform the job.[3]

---

[3] Once Grupo began its efforts to recover the money it lost, Ingvartsen asserted that Energy Subsea had nothing to do with the project because Ingvartsen AS was the entity performing the job.  This claim was not supported by the evidence at trial.

Grupo relied upon Ingvartsen's repeated assurances that he would line up a vessel and would perform the job. He never performed. When Grupo began requesting some of its money back, Ingvartsen fabricated invoices from Ingvartsen AS to justify keeping hundreds of thousands of dollars to which he was not entitled.

At the same time Ingvartsen was representing that Energy Subsea would perform the job, he knew that Energy Subsea had $100 in its bank accounts. After Energy Subsea received $322,210 of Grupo's money in October 2017, it very quickly spent the money on things having nothing to do with the Grupo project. By the end of October, Energy Subsea had only $110,918.09 left in its bank account, nowhere near enough to hire a vessel and perform the job. By the end of November 2017, Energy Subsea had only $54,903.53 in its account, despite having received another $200,000 from Grupo on November 6, 2017. By the end of December, the account had been depleted to $10,083.35. Energy Subsea could not have chartered a vessel to perform this job during that time frame, as it had no money with which to charter a vessel. Yet, Ingvartsen and Energy Subsea continually assured Grupo a vessel would soon be underway.

Grupo has asserted fraud claims against Energy Subsea and Ingvartsen because they induced Grupo to pay $616,046.32 above the original contract value based on false promises that if the additional amount were paid Energy Subsea would perform the Contract. These fraud in the inducement claims are not subject to the maritime economic loss rule first established by the United States Supreme Court in *East River S.S. Corp v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S. Ct. 2295, 90 L.Ed.2d 865 (1986). Generally, in admiralty, a "party may not recover for economic losses not associated with physical damages." *Kingston Shipping Co. v. State of Florida*, 667 F.2d 34, 35 (11th Cir. 1982). Stated differently, the maritime economic loss rule "provides

that a tort action may not lie where the basis for liability arises from a contract." *St. Clair Marine Salvage, Inc. v. M/Y Blue Marlin*, 2014 WL 2480587, at 4 (E.D. Mich. June 3, 2014) (citing *East River S.S. Corp.*, 476 U.S. at 871)).

In this case the question for the Court is whether the maritime economic loss rule precludes Grupo's recovery of damages for Energy Subsea and Ingvartsen's fraud. Case law in the Eleventh Circuit says that it does not. Specifically, in the case of *R/V Beacon LLC v. Underwater Archaeology & Exploration Corp.,* 2014 WL 4930645 (S.D. Fla. Oct. 1, 2014), the court followed what had been described by the Third Circuit as "an emerging trend among jurisdictions which recognizes 'a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent of the underlying contract.'" *R/V Beacon LLC,* 2014 WL 4930645 (quoting *Werinski v. Ford Motor Co.*, 286 F.3d 661, 676 (3rd Cir. 2002)). That emerging trend was based in part on the recognition that the Supreme Court in *East River* noted that it was not opining on "whether a tort cause of action [could] ever be stated in admiralty when the only damages sought are economic." *See East River S.S. Corp.*, 476 U.S. at 871 n. 6. The type of fraud claims the Third Circuit suggested may be exempt from the economic loss rule would be a "fraud in the inducement" claim. *Werinski*, 286 F.3d at 676.

In this instance, the allegations in the Complaint, and the evidence introduced at trial, establish Energy Subsea induced Grupo into paying $616,046.32, but then not using the money to perform its obligations under the Energy Subsea Contract. Instead, at least some of the money went to Ingvartsen, while other money was spent on things wholly unrelated to the Contract. By March 2018, almost all of the money paid by Grupo was gone, yet almost nothing had been provided. This fraud claim advanced by Grupo is distinct from its breach of contract claim. This

is the same situation as *Beacon* where the court concluded the plaintiff's fraud claim was not barred by the maritime economic loss rule.  In *Beacon*, the defendant requested money to make repairs to a vessel, but instead pocketed the money, converting it to its own personal use, much like the present case.  Such fraud claim is not covered by the maritime economic loss rule.

The Court finds the testimony and evidence introduced during trial supports fraud claims against both Energy Subsea and Ingvartsen.

III.    **DAMAGES**

Having found in favor of Grupo on its claims of breach of maritime contract, fraud and alter ego liability, the Court will now consider the appropriate measure of damages.  Grupo seeks recovery of funds paid and its costs of cover on its breach of contract claim.  Grupo also seeks compensatory and punitive damages on its fraud claim.  As to both claims, Grupo seeks a judgment against both Energy Subsea and Ingvartsen.  The Court will address each claim in turn.

**A.  Breach of Maritime Contract.**

The measure of damages in a case of breach of maritime contract is well settled:

> The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997). "[T]he general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347 cmt. c (1981). Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty.  *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002).  While the amount of damages need not be "ascertainable with absolute exactness or mathematical precision[,]" recovery for speculative damages is precluded.  *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563 (citation omitted).

*Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  In this case, Grupo has identified both the funds it paid as well as the additional costs it paid to arrange for a third party to ultimately perform the contract.  These costs are also recoverable:

> Available damages include the non-breaching party's mitigation expenses, specifically its costs of arranging alternatives to the breaching party's required performance.  *See* Restatement (Second) of Contracts (1981) § 347, cmt. a, b; *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1067–68 (Fed. Cir. 2001).  "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage."  *Indiana Michigan*, 422 F.3d at 1375.  Mitigation damages are to be awarded to "reimburse a non-breaching party to a contract for the expense it incurred in attempting to rectify the injury the breach caused it."  *Citizens Federal Bank v. United States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007) (citing Restatement (Second) of Contracts § 347 cmt. c (1981)).

*Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 286 (2017).

In this respect, Grupo has demonstrated by a preponderance of evidence that it has sustained damages related to the breach in the amount of its contract with Energy Subsea, which it paid in full.  Grupo also may recover the cost incurred to hire Bordelon Marine to actually perform the work of the contract with Energy Subsea.  Grupo proved this amount to be $1,727,590, which is the value of the breach of contract claim.

The Court's review of the Contract reveals a clause purporting to limit the liability of Energy Subsea.  Neither party raised this clause during the trial and the Court ordered post-trial briefing by the parties.  The Court finds it must be addressed.  Clause 12 of the Energy Subsea Contract states:

**Limitation of Liability**
The Contractor's total cumulative liability to the Company arising out of or related to the performance of the Contract in tort, otherwise at law or in any legal proceeding shall be limited to the amount as specified in Schedule 4 (Insurance Limits of Liability) provided, however, the above limitation shall not apply to the Contractor's liability relating to the death or personal injury of any person arising out of or connected in any way to the performance of the Contract.

(Ex. 15) (emphasis in original).  Schedule 4 of the Contract establishes the contractual limitation

of liability:

**Limitation of Liability**
In Clause 12, the limit shall be USD 650,000 equal to the contract value for the first month of operation.

(*Id.*) (emphasis in original).

The Eleventh Circuit has allowed parties to limit their liability in maritime contracts, that

is, to determine a maximum amount a party may be required to pay for claims arising from the

performance of the contract.  *See Edward Leasing Corp. v. Uhlig & Assoc.*, 785 F.2d 877 (11th Cir.

1987).  Such a limitation clause must be clear and unequivocal and there must exist equal

bargaining power between the parties.  *See Diesel Repower Inc. v. Islander Invs., Ltd*., 271 F.3d

1318 (11th Cir. 2001).  Specifically,

[T]he court must apply a three-step test to determine whether the limitation on liability clause is enforceable. First, the clause must clearly and unequivocally indicate the parties' intentions. Second, the clause may not absolve the repairer of all liability and the liability risk must still provide a deterrent to negligence. Third, the "businessmen" must have equal bargaining power so there is no overreaching.

*Id*. at 1324.

Here, the clause in question is clear and unequivocal and it seeks to limit liability to the

value of the first month of operation rather than absolve Energy Subsea of all liability.  Although

the Court finds this clause to be enforceable as written, it cannot be said to limit Grupo's recovery

as suggested by Defendants.  (*See* Doc. 81).  The evidence before the Court reveals Energy Subsea did not perform its obligations under the Contract and thus it cannot avail itself of the benefit of the contract's limitation of liability provision.  *Ireland v. Craggs*, 56 F.2d 785, 787 (5th Cir. 1932) (". . . men full grown and of sound mind may not, while holding to the benefits of a contract, escape its burdens." (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U. S. 353 (1931); *Baltimore R. R. v. Voigt*, 176 U. S. 498 (1900)).  Alternatively, the limitation clause is inapplicable because Plaintiff's claims do not "aris[e] out of or relate[] to" Defendants' performance of the Contract.  Defendants did not perform.

Grupo is also entitled to recover damages from Defendants for the additional expenses it reasonably incurred when it contracted with Bordelon Marine to perform the Contract.  Grupo paid Bordelon $1,727,000 to complete the scope of work specified in the Contract.  Therefore, Grupo is entitled to recover the amount it paid Bordelon.  Accordingly, the Court shall enter judgment in favor of Grupo and against Energy Subsea and Ingvartsen on the breach of contract claim in the amount of $1,727,000, representing the original contract amount plus cover damages .

**B.  Fraud.**

The Court has found in favor of Grupo on the fraud claim.  All naturally resulting damages are recoverable, but they must be actual damages proximately resulting from the Defendants' fraudulent actions.  *See P & S Bus. Machines, Inc. v. Olympia U.S.A., Inc.*, 707 F.2d 1321, 1323–24 (11th Cir. 1983).  Grupo presented evidence of theses compensatory damages at trial.

Grupo is entitled to punitive damages, as Energy Subsea and Ingvartsen consciously and deliberately engaged in fraud with regard to Grupo.  *See* Ala. Code § 6-11-20(a).  Fraud, for

purposes of an award of punitive damages, is defined by Alabama law to be an intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and was committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury. *Id*. at § 6-11-20(b). A "gross" misrepresentation is one that is inexcusable, flagrant, or shameful. *Talen Tree Pers. Servs., Inc. v. Fleenor*, 703 So. 2d 917, 924 (Ala. 1997). In *Prudential Ballard Realty Co., Inc. v. Weatherly*, 792 So. 2d 1045, 1049 (Ala. 2000), the Alabama Supreme Court explained that the "the terms 'malicious' and 'oppressive,' . . . and the term 'gross,' . . . are subsumed within the definition of fraud in § 6-11-20(b)(1)." *Id*. (also finding that "for purposes of applying § 6-11-20(b)(1), the terms 'gross,' 'malicious,' and 'oppressive' are redundant."). The *Prudential* Court concluded that "it cannot seriously be argued that an intentional act of fraud committed for the purpose of 'depriving a person or entity of property or legal rights or otherwise causing injury,' is not a gross, malicious or oppressive act, as those terms are defined in § 6-11-20." *Id*.

Pursuant to Alabama Code section 6-11-27, a principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant, or employee were calculated to or did benefit the principal, employer, or

other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act. Ala. Code § 6-11-27(a). Therefore, Alabama law recognizes vicarious liability of a principal for the punitive damages of an agent if the principal authorized or ratified the wrongful conduct, or if the acts of the agent were calculated to or did benefit the principal.

As required by Alabama Code § 6-11-20, the Court finds Energy Subsea and Ingvartsen's fraud was proven by clear and convincing evidence. For almost a year, Ingvartsen repeatedly misled Grupo into thinking that he, through Energy Subsea, was ready, willing and able to perform. On multiple occasions he demanded substantial sums of additional money from Grupo, all under the premise that when the additional money was received, performance would occur. However, no performance was ever rendered. The necessary equipment was never assembled, no vessel was ever chartered, no mobilization ever began and then, when Grupo refused to meet the demands for even more money, Ingvartsen said he would not return what he had already received, and that Grupo would have to sue to get any portion of the money back. Ingvartsen admitted that the money paid by Grupo had been spent. It is clear it was not spent in connection with this job. Ingvartsen ignored Grupo's request for a return of the money. Ingvartsen undoubtedly thought he could act with impunity, creating a situation in which Grupo had no real choice other than to give him more and more money to try to get the job done. In short, Ingvartsen and Energy Subsea intentionally and repeatedly lied to Grupo. In reliance upon those lies, Grupo paid $1,266,046.32 ($616,046.32 more than it originally contracted for) and received virtually nothing in return.

Grupo's compensatory damages related to this fraud amount to the additional funds it paid above the original contract amount $616,046.32.  According to Alabama Code section 6-11-21, punitive damages shall not exceed three times the compensatory damages of the party claiming punitive damages.  Because of Ingvartsen and Energy Subsea's egregious fraudulent actions, a punitive damages award of three times the compensatory damages therefore, $1,848,138.96 is appropriate in this case.  As Energy Subsea's managing member, Ingvartsen was an agent, servant, and employee of Energy Subsea and because Ingvartsen was Energy Subsea's managing member, Energy Subsea authorized and/or ratified his fraudulent conduct.  Further, it is without question that Ingvartsen's fraudulent conduct was calculated to benefit, and actually did benefit, Energy Subsea and him.  As a result, Energy Subsea and Ingvartsen are liable for the punitive damages award.  Accordingly, the Court awards Grupo $1,848,138.90 in punitive damages against Ingvartsen and Energy Subsea.  Based on the totality of Defendants' fraudulent conduct, the Court finds Grupo is also entitled to recover its costs and reasonable attorneys fees.  Grupo shall submit its bill of costs and fees within 30 days.  Defendants shall file any objection to Grupo's bill of costs and fees within 10 days of the date the bill of costs and fees is filed.  The Court will then take the fee request under submission and fees and costs the Court finds supported will be incorporated into the judgment in this case.

## IV.    CONCLUSION

Based on the Court's findings judgment is entered in favor of Plaintiff Grupo HGM Tecnologias Submarina, S.A. on Counts One and Two of the Amended Complaint.  Grupo is awarded $1,727,000 as to Count One and $1,848,138.90 as to Count Two.  Because the Court finds in favor of Grupo on the alter ego theory, the total judgment of $3,575,138.90 shall be joint

and several as to Energy Subsea and Ingvartsen.  The Court will enter a final judgment in this case after it determines the question of attorney fees and costs to Grupo.

   **DONE and ORDERED** this 12th day of October, 2021.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE